FILED
LODGED
ENTERED
RECEIVED

MAR 2 6 2001

AT SEATTLE
CLERK U.S. DISTRICT COURT
BY WESTERN DISTRICT OF WASHINGTON
DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| REBECCA HUGHES, et al., | NO. C98-1646C |
| Plaintiffs, | |
| v. | |
| MICROSOFT CORPORATION, et al., | |
| Defendants. | |
| DONNA VIZCAINO, et al., | NO. C93-0178C |
| Plaintiffs, | |
| v. | FINDINGS OF FACT |
| MICROSOFT CORPORATION, et al., | AND CONCLUSIONS OF LAW |
| Defendants. | |

These matters come before the Court on the parties' motion for approval of the December 8, 2000 Class Action Settlement Agreement (the "Settlement Agreement" or "S.A."). The Court, having considered the papers submitted by the parties and the oral argument pertinent hereto, hereby finds and rules as follows.

## I.   INTRODUCTION

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
1

779

On December 12, 2000 and January 10, 2001, this Court entered orders (the "Preliminary Approval Orders") preliminarily approving the terms of the proposed settlement in *Vizcaino v. Microsoft*, No. C93-0178C, a certified class action, and *Hughes v. Microsoft*, No. C98-1646C, a putative class action. In the Preliminary Approval Orders, the Court also preliminarily approved class counsel's fee request.

As part of the Preliminary Approval Orders, this Court scheduled a hearing at which class members who objected to the settlement could be heard. Proper notice of the settlement and fairness hearing was provided to the class. Information concerning the identity of these individuals was gathered from the records of temporary employment agencies, Microsoft's records, and information forms submitted by class members to class counsel.

The notice to the class, which included notice of the fairness hearing, notice regarding class member rights to exclude themselves from the case, and notice regarding the submission of objections, was mailed to approximately 37,155 individuals who performed assignments for Microsoft between December 1986 and June 30, 2000, and who were paid as independent contractors or by third-party temporary employment agencies. Approximately 5,773 of the notices were undeliverable.

A summary notice was also published in *The Seattle Times* and *The Seattle Post Intelligencer* on December 29, 2000, and January 16, 2000; in *The San Francisco Examiner* on December 29, 2000, and January 5, 2001; and in *The News Tribune* on December 29, 2000, and January 6, 2001. News of the settlement also received nationwide and even worldwide media and Internet coverage.

In addition, the notice and the Settlement Agreement were published on class counsel's website (www.bs-s.com). The site received over 21,000 user sessions between December 12, 2000, when the notice and settlement agreement were posted, and February 8, 2001.

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
2

1    The notice to class members was the best notice practicable and complied with the

2    Preliminary Approval Orders, Federal Rule of Civil Procedure 23, and due process. *See Silber* v.

3    *Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994).

4    On February 27, 2001, the Court conducted a hearing to determine the fairness,

5    reasonableness, and adequacy of the settlement. The Court, having considered the submissions and

6    arguments of the parties and the proponents and opponents to the settlement, as well as the

7    proceedings in this litigation, hereby GRANTS final approval of the settlement pursuant to Federal

8    Rule of Civil Procedure 23(e). In support of this conclusion, the Court makes the following

9    findings of fact and conclusions of law.

10   ## II.   HISTORY OF THE LITIGATION

11   The two cases resolved by this Settlement Agreement have a protracted history that,

12   including pre-filing administrative procedures, extends almost twelve years. Between 1987 and

13   1990, Microsoft supplemented its employee work force with workers known as "freelancers," who

14   agreed with Microsoft in writing that they would not be eligible for Microsoft employee benefits.

15   Those benefits included the Employee Stock Purchase Plan ("ESPP"), a plan governed by

16   Washington state law that allows regular employees to purchase Microsoft stock at a discount, and

17   the Savings Plus Plan ("SPP"), a "401(k)" plan governed by the Employee Retirement Income

18   Security Act of 1974, 29 U.S.C. § 1001 et seq.

19   In 1989, after evaluating the work done by, and the working conditions of, certain

20   freelancers, the IRS took the position that, for federal employment tax purposes, some of the

21   freelancers qualified as employees of Microsoft under the IRS's rules. Microsoft resolved the

22   matter with the IRS.

23   In 1992, eight former freelancers brought the *Vizcaino* action, challenging Microsoft's

24   refusal to provide them with benefits under the ESPP, the SPP, and other benefit programs such as

25   FINDINGS OF FACT AND CONCLUSIONS OF LAW -

26   3

Microsoft's health plan, its short and long-term disability plans, and with paid vacation, holiday, and sick time. The class representatives in *Vizcaino* are Donna Vizcaino, Jon Waite, Mark Stout, Geoffrey Culbert, Lesley Stuart, Thomas Morgan, Elizabeth Spokoiny, and Larry Spokoiny (the "*Vizcaino* Named Plaintiffs"). In 1993, District Court Judge Carolyn Dimmick certified a class composed of "[a]ll persons employed by the Microsoft Corporation in the United States who are denied employee benefits because they are considered independent contractors or employees of third-party employment agencies, but who meet the definition of employees of Microsoft Corporation under the common law." *Vizcaino* v. *Microsoft Corp.*, Docket No. 47, at 13 (W.D. Wash. July 21, 1993).

Following the 1993 certification of the class, Judge Dimmick granted Microsoft's motions for summary judgment and dismissed each of plaintiffs' claims. *Vizcaino* v. *Microsoft Corp.*, Docket Nos. 223 and 225 (W.D. Wash. June 20, 1994 and July 6, 1994). Plaintiffs appealed Judge Dimmick's summary judgment ruling with respect to the ESPP and SPP benefits, but did not challenge the dismissal of their claims to other employment benefits.

In 1996, a panel of the Ninth Circuit reversed the Judge Dimmick's ruling as to the ESPP and SPP benefits. *Vizcaino* v. *Microsoft Corp.*, 97 F.3d 1187 (9th Cir. 1996). The Ninth Circuit granted Microsoft's petition for rehearing, and, in 1997, the Ninth Circuit en banc issued a decision reversing Judge Dimmick's denial of plaintiffs' claims for ESPP benefits. The Ninth Circuit directed Judge Dimmick to resolve on remand "[a]ny remaining issues regarding the rights of a particular worker in the ESPP and his available remedies." *Vizcaino* v. *Microsoft Corp.*, 120 F.3d 1006, 1015 (9th Cir. 1997), *cert. denied*, 522 U.S. 1098 (1998). The Ninth Circuit ordered Judge Dimmick to remand plaintiffs' claims for SPP benefits to the plan administrator for review.

The ESPP permits eligible employees to purchase Microsoft stock at a discounted price during offering periods commencing January 1 and July 1 of each year. Eligible employees enroll

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
4

1    in the ESPP by authorizing a payroll deduction of 2%, 4%, 6%, 8%, or 10% of their base pay,

2    which is paid into the ESPP during each offering period. At the end of each offering period,

3    Microsoft issues to each participant the number of whole shares that can be purchased with the

4    participant's payroll deductions, at a discount price. The ESPP discount price is 85% of the market

5    price on the first or the last day of each offering period, whichever is lowest. Alternatively, a

6    participant may, at any time before the end of the offering period, elect to purchase no shares and

7    have the full payroll deduction returned, without interest. Individuals who fail to work through the

8    end of an ESPP offering period have their deferrals returned in cash and receive no stock in that

9    period.

10   Judge Dimmick ruled that the measure of damages for the class members' ESPP claims

11   should be based on the assumption that eligible individuals received stock at the discounted price in

12   each offering period and held it for one year. *Vizcaino* v. *Microsoft Corp.*, Docket No. 510 (W.D.

13   Wash. October 5, 1998). The Court assumed that an average participation rate of eligible

14   employees would be used to determine the amount assumed to be invested through the ESPP, for

15   purposes of applying a damages measure. Pending but unresolved as of the date of the Settlement

16   Agreement was Microsoft's motion seeking reconsideration of Judge Dimmick's damages measure,

17   as well as its alternative motion for partial summary judgment concerning the interpretation of the

18   measure established in Judge Dimmick's earlier order.

19   Following the Ninth Circuit's 1997 remand, the SPP administrator denied the class

20   members' claims for SPP eligibility. (2/22/01 First Monaco Decl., Ex. 2.) The class members

21   appealed to the plan's administrative committee, which denied the appeal in a determination

22   finalized on October 1, 1999. (2/22/01 First Monaco Decl., Ex. 3.) The issue therefore became

23   ready for judicial review by the Court, but it had not been argued or decided at the time of the

24   settlement.

25
26   FINDINGS OF FACT AND CONCLUSIONS OF LAW -
     5

1    After the 1997 remand, Judge Dimmick held that the *Vizcaino* class included only certain

2    individuals who had performed assignments for Microsoft before 1990. In response, the *Vizcaino*

3    Plaintiffs filed several motions and a petition for a writ of mandamus in the Ninth Circuit. In

4    addition, the *Hughes* case was filed. *Hughes* is a putative class action whose members include

5    individuals who performed assignments for Microsoft after 1990. The plaintiffs in the *Hughes* case

6    are Rebecca Hughes, Karen Jacobsen, Anita Zuidweg, Michael Schramm, Roberta Wilson, John

7    Schussler, Richard Pauli, Jim Emerson, Steven Fulgham and Mehdi J. Beygi (the "*Hughes* Named

8    Plaintiffs"). *Hughes* was filed as a protective measure, brought on behalf of persons whom

9    plaintiffs' counsel asserted should be in the *Vizcaino* class but, by the terms of the District Court's

10   Orders, were not. By agreement of the parties and with the approval of the Court, *Hughes* has been

11   largely inactive since its initiation, in view of *Vizcaino III* and later due to settlement discussions.

12       The Ninth Circuit granted the mandamus petition, held that the *Vizcaino* class includes

13   individuals who performed assignments for Microsoft after 1990, and described factors to be

14   applied to determine whether individuals paid through temporary employment agencies were

15   potentially eligible to participate in the ESPP. *Vizcaino* v. *United States Dist. Court*, 173 F.3d 713

16   (9th Cir. 1999), *amended by* 184 F.3d 1070 (9th Cir. 1999) (*Vizcaino III*), *cert. denied*, 528 U.S.

17   1105 (2000). As a result of the Ninth Circuit's decision, all of the members of the class sought to

18   be represented by the *Hughes* Plaintiffs are members of the *Vizcaino* class as defined in *Vizcaino*

19   *III*.

20       Over a two-year period, the parties had numerous face-to-face meetings, and several

21   mediation sessions with the Honorable George Finkle of Judicial Dispute Resolution, in order to

22   explore settlement of this action. During that period, the parties exchanged and analyzed data

23   pertinent to analysis and development of damages estimates. Mediation efforts before Judge Finkle

24   were not successful. This Court then ordered the parties to engage in settlement discussions with

25   FINDINGS OF FACT AND CONCLUSIONS OF LAW -

26   6

the Honorable William L. Dwyer, whom this Court appointed as settlement judge. After two days of negotiation and building on the data developed during mediation, Judge Dwyer recommended the framework of the settlement and the amount of $96.885 million as a fair and reasonable compromise.

Following the meetings with Judge Dwyer, the parties negotiated the particulars of the settlement. On December 8, 2000, the parties submitted to the Court the Settlement Agreement, which was based on Judge Dwyer's recommendations. This Court preliminarily approved the settlement on December 12, 2000.

Throughout the course of this litigation, the defendants disputed the claims and denied that the plaintiffs were entitled to any relief. The proposed settlement is a result of compromise and neither party concedes that the other party's position is meritorious. The defendants believe the amount of $96.885 million is substantially greater than warranted by the claims.

## III. NATURE OF THE RELIEF TO THE CLASS

Subject to the terms of the settlement, Microsoft will deposit $96.885 million into a Settlement Fund. After deducting payments such as incentive awards to the representative plaintiffs, a fee to class counsel, and the costs of settlement and claims administration, the balance will be distributed to eligible class members.

In order to be eligible to take under the Settlement Agreement, a person must have worked for Microsoft for nine months and worked for 750 hours or more during each six-month offering period between January 1, 1987 and June 30, 2000. Regarding the nine-month eligibility threshold, the parties recognized that (1) short-term workers do not typically meet the test for common law employment; (2) a factual analysis of whether a particular short-term worker was or was not a common law employee would be extraordinarily time consuming and expensive to determine (indeed, the expense and difficulty of making such determinations were part of the impetus for

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
7

settling the cases); and (3) a precise line regarding factors relevant to common law employee status, the crux of class membership, is difficult to draw. Accordingly, the parties compromised at nine months.

Eligibility also requires that the class members worked 750 hours or more in each "Eligible Period," i.e., each six-month offering period between January 1, 1987 and June 30, 2000. The 750-hour requirement is also a reasonable compromise. Because class members were not paid for sick days and holidays, in effect they worked fewer than the 1,040 hours worked by full-time employees. The 750 hours per eligibility period thus takes into account unpaid days off.

Distribution to each qualifying class member is based on a payment formula. For offering periods before 1999, the payment formula is based on the valuation measure in Judge Dimmick's October 5, 1998 order. For offering periods before 1999, the payment formula is based on the following components: the average participation rate in the ESPP by Microsoft employees, the historical average compensation of $27,000 per offering period, the price on the NASDAQ of Microsoft shares during the offering period less the 15% discount, a holding period of one year (including any stock splits in that year), and interest at 12% per annum thereafter. The payment formula is described more fully in the Settlement Agreement.

For offering periods beginning January 1, 1999 through June 30, 2000, the payment formula is adjusted slightly to avoid the adverse effect on class members of post-1999 changes in the price of Microsoft stock. This compromise is reasonable given the uncertainties regarding the proper manner in which to measure the appropriate damages for plaintiffs' ESPP claims.

After 1997, Microsoft made important changes in its staffing and worker classification practices. In the fiscal year beginning July 1, 1999, Microsoft hired over 3,000 class members as W-2 employees entitled to participate in its employee benefit plans and programs. Microsoft has adopted practices to ensure the proper classification of independent contractors, temporary agency

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
8

employees, and other staff, including a comprehensive review of practices regarding independent

contractor classifications which took place in 1997. It has conducted reviews of ongoing work and

has instituted practices designed to limit the length of temporary agency employees' assignments

for Microsoft to ensure that those classified as temporary employees are in fact classified correctly.

In view of Microsoft's current practices and policies, declaratory or injunctive relief is neither

necessary nor appropriate as part of the settlement, and the Settlement Agreement therefore does

not include any provision restricting or imposing conditions on Microsoft's future policies or

practices. As set out in the Settlement Agreement, nothing in that agreement constitutes an express

or implied contract with regard to Microsoft's future policies or practices.

The Court finds that all of the eligibility criteria and the formulae for distribution of the

Settlement Fund are fair and reasonable. In particular, the eligibility criteria that the settlement

uses to approximate common law employee status are fair and reasonable. *See Nationwide Mut.*

*Ins. Co.* v. *Darden*, 503 U.S. 318, 323 (1992) (listing the duration of the relationship between the

parties as an incident of common law employee status); *Restatement (Second) of Agency* § 220

(1958) (listing "the length of time for which the person is employed" as a factor relevant to the

issue of employee status). By using these objective criteria, the settlement obviates the need for

extended and burdensome litigation regarding the particulars of individuals' assignments at

Microsoft, thereby achieving greater uniformity and hastening the time for payment. Washington

state courts adjudicating class action disputes of this kind have endorsed this mechanism of

approximating common law employee status as being in accord with Washington state law. *See,*

*e.g.*, Class Action Settlement Agreement, *Clark* v. *King County*, No. 95-2-29890-7 SEA, at 2, 23

(Wash. Super. Ct. June 7, 2000) (class action settlement agreement).

## IV.    THE FAIRNESS AND REASONABLENESS OF THE SETTLEMENT

There is a strong judicial policy favoring settlement of class actions. *Class Plaintiffs* v. *City*

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
9

*of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). The Ninth Circuit has set forth seven factors courts are to consider when determining whether a proposed settlement is fair, adequate and reasonable. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000). These factors are (1) the lack of fraud or collusion behind the settlement; (2) the risk, complexity, expense and likely duration of the litigation; (3) the stage of the proceedings and the extent of discovery; (4) the adequacy of the proposal; (5) the experience and views of class counsel; (6) the strength of the remaining claims and damages; and (7) the reaction of class members to the proposed settlement. *Id.*

**A.      Lack of Fraud or Collusion**

In addition to the fact that the settlement was mediated with the assistance of the Honorable William L. Dwyer, the duration, intensity, and extent of the litigation demonstrate the non-collusive nature of the settlement. Judge Dwyer's recommendation that the settlement is fair and reasonable supports a finding that the settlement is in fact in the best interests of the class members. *See In re Pacific Sec. Enters. Litig. (Principe v. Ukropina)*, 47 F.3d 373, 378 (9th Cir. 1995). Furthermore, the Court has seen no evidence, and there has been no suggestion, that fraud or collusion played any part in the settlement. The Court therefore finds that this factor weighs in favor of approving the settlement as fair, adequate, and reasonable.

**B.      Risk, Complexity, Expense, and Likely Duration of the Litigation**

The Court finds that the risk, complexity, expense, and duration of this litigation weigh in favor of the fairness and reasonableness of the settlement. The entire case was extremely risky and of great magnitude and complexity and defendants' opposition throughout has been vigorous. Other cases involving similar facts have been decided against the plaintiffs' position. There were no precedents supporting the plaintiffs' claims at the time the action was filed and there were no cases certifying a class of alleged common law employees who were considered "independent

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
10

1    contractors" or workers paid through third-party agencies at the time the action was filed. Not only

2    that, but plaintiffs had even signed documents agreeing that they were not entitled to benefits. The

3    legal issues were novel, complex, difficult, and vigorously contested. Thus, because of the still

4    outstanding unresolved matters, major factual disputes, and unresolved damages issues in the

5    litigation, a reasonable compromise is in the interests of the class.

6        This litigation, not including the initial administrative proceedings, has a protracted, eight-

7    year history. The Ninth Circuit has already reviewed this case three times, and the defendants

8    twice petitioned for a writ of certiorari to the United States Supreme Court. Numerous amici

9    submitted briefs in the appellate courts and in this Court, on both sides. In addition to the matters

10   still pending before this Court, it is likely that there would be two to three additional years of

11   appellate proceedings if this matter proceeded to a final judgment. Thus, the potential further delay

12   here would be considerable. The Court finds that the complexity of the issues, the risk of

13   continued litigation, and the probability of substantial further delay support the reasonableness of

14   the proposed settlement.

15   **C.    The Stage of the Proceedings and the Extent of Discovery**

16       The record reflects that there has been substantial discovery in this case and that class

17   counsel had the assistance of a computer consultant and economics expert to evaluate the evidence

18   and assess the value of the potential recovery. However, very substantial discovery would still

19   have to occur if the case were to proceed to trial.

20   **D.    The Adequacy of the Proposed Settlement**

21       Recovery under the settlement is dependent upon principles of common law employee

22   status. A large number of individuals, estimated at over 10,000, are expected to obtain monetary

23   relief. However, many—indeed the majority—of class members are expected to receive no

24   recovery under the settlement, mainly because they were short term workers. Moreover, the

25   FINDINGS OF FACT AND CONCLUSIONS OF LAW -
26   11

amounts of recovery will differ among class members. However, these differences are permissible because they are based on the differing circumstances of the class members' individual claims. *See, e.g., Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1377-78 (9th Cir. 1993) (approving disparate treatment of class members that is based on the facts of the case and is not "irrational"). The Court finds that the settlement is adequate, thus supporting approval of the Settlement Agreement.

## E.   Views of Class Counsel

Class counsel support approval of the proposed settlement. In determining whether to approve a settlement, the Court keeps in mind the unique ability of class counsel to assess potential risks and rewards of litigation. "A presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced capable counsel after meaningful discovery." *Manual for Complex Litigation (Third)* § 30.42 (1995).

Here, class counsel are experienced class action litigators whose practice in the area of employee rights and benefits spans over twenty years. Class counsel have an "outstanding reputation . . . in the employment law national legal community." (Tobias Aff., ¶12.) In addition, the Court is familiar with the quality and thoroughness of class counsel's work through materials presented to the Court. Class counsel's opinion is accorded considerable weight and supports the fairness and adequacy of the proposed settlement.

## F.   Strength of the Remaining Claims and Damages

Although plaintiffs achieved substantial success on their ESPP claim, pending was defendants' motion for reconsideration concerning the valuation of that claim. Had that motion been granted, the value of plaintiffs' ESPP claims would have been substantially less than the value under Judge Dimmick's formula. Plaintiffs' SPP claim was not resolved, but was rejected on remand to the plan administrator. Still unresolved was the identification of individuals or groups of

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
12

individuals who are within the definition of common law employee, and that process would have been expensive and time-consuming, with an uncertain outcome with respect to persons who were actually entitled to recover. The Court finds that these considerations support approval of the proposed settlement.

## G.    Reaction of Class Members

### 1.    Opt-outs

The proposed Settlement Agreement afforded those individuals who did not wish to participate in the settlement, and who did not wish to be included in the class, the opportunity to opt-out. Eighty-six individuals submitted valid timely requests to be excluded from the case and the settlement. Approximately half of them stated that they excluded themselves because they did not agree with the litigation or they had very short time periods working for Microsoft. These eighty-six individuals, whose identities are set forth in Annex A of this order, are hereby excluded from the litigation and excluded from receiving any relief in this settlement.

As of the opt-out deadline of January 26, 2001, the settlement administrator had received 21 opt-out forms that were defective because, contrary to the requirements of the Preliminary Approval Orders (which were set forth in the notices sent to class members), they either were not signed, were not dated, or did not include a certification under penalty of perjury or notarization. The Court finds that the requirement that opt-outs be signed, notarized, and dated are reasonable measures to protect against fraud. In addition, the settlement administrator has received late opt-out forms.

The Court finds that the procedures for opting out from the class were plainly set forth in the notice of the settlement and were not difficult to follow. Moreover, given the publication of the notice of the settlement and the wide-spread news coverage of the settlement (2/22/01 Second Monaco Decl., Exs. 1-103), class members who did not receive individual notice of the settlement

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
13

should nonetheless have become aware of the settlement and the means of opting out of the class had they been diligently monitoring their rights. Because Microsoft had the right to withdraw from the settlement if a certain percentage of class members opted out (S.A. ¶¶ 121-22), Microsoft was entitled to know the number of opt-outs. Accordingly, the Court declares that only those class members set forth in Annex A are excluded from the class.

**2.     Class Member Approval**

The Court finds that the class members overwhelmingly support the settlement. Over 37,000 notices were sent and over 3,600 class members contacted class counsel wanting to participate. After the settlement was announced, 2,745 class members (some of whom had previously contacted class counsel) wrote to class counsel wanting the benefits of the settlement. They did not object to the adequacy of the settlement, the amount of the incentive awards to the representative plaintiffs, nor to class counsel's fee request. Many class members also wrote to class counsel affirmatively supporting all aspects of the settlement. As already discussed, less than 1% of the class opted out and only nine objections were submitted. In view of the widespread publicity about the settlement, these indicia of the approval of the class of the terms of the settlement support a finding of fairness under Rule 23. *See Hanlon* v. *Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998); *Marshall* v. *Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977).

**3.     Objections**

Only nine objections to the settlement were filed, either individually or in a group. At the fairness hearing on February 27, 2001, appearances were made on behalf of only two of the objections.

**a.     The Hatfield Objectors**

Counsel for one group of objectors (Danny Hatfield, Thomas Morgan, Stephen Oringdulph, Lesley Stuart, Donna Vizcaino, and Felicity Wilson, collectively the "Hatfield Objectors")

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
14

appeared and stated that they did not object to the overall amount of the settlement, but objected to class counsel's fee request[1] and questioned some aspects of the operation of the Settlement Agreement. At the Court's request, in response to the questions regarding operation of the agreement, class counsel and defendants' counsel agreed to make amendments and clarifications to the Settlement Agreement. The agreed modifications are as follows: (1) Notice will be provided, in connection with the claim administration process, that class members who disagree with the Settlement Administrator's determinations may petition this Court for a review of those determinations (*see* S.A. ¶ 95), and the Court shall retain jurisdiction over *Vizcaino* and *Hughes* in order to adjudicate such disputes and set schedules, including cut-off dates, for class members to challenge the Settlement Administrator's decisions; (2) copies of the Settlement Administrator's proposed plan of distribution will be provided to the class representatives, with sensitive and identifying information removed (*see* S.A. ¶ 100); (3) the parties will not further amend the Settlement Agreement unless the Court approves such amendments following written motion, and notice of such a motion will be posted on class counsel's web site (*see* S.A. ¶ 116); (4) class counsel will provide notice to the class representatives regarding the selection of a charitable entity that will receive any unclaimed funds from the Settlement Fund (*see* S.A. ¶ 104); (5) 75% of the attorney fee award to be distributed to class counsel will be disbursed from the Fund within fourteen days following the Effective Date, and the remaining 25% will be disbursed upon Court approval of the Final Report (*see* S.A. ¶¶ 76, 106). The Hatfield Objectors agreed, through counsel, that these modifications to, and clarifications of, the Settlement Agreement satisfied their concerns. The Hatfield Objectors also raised questions regarding the incentive fee awards to the

---

[1] The Court will address the fee award requested by class counsel and the objections to that award in a subsequent order, after class counsel provide a supplemental pleading containing more detailed time record information and objectors have a chance to respond, as ordered at the fairness hearing.

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
15

named plaintiffs; those concerns are addressed *infra*.

**b.    Robert Percival**

Robert Percival, who was the only objector besides the Hatfield Objectors to make an appearance at the fairness hearing, stated at the fairness hearing that he agreed with the overall amount of the settlement agreement, but asked the Court to modify the Settlement Agreement to establish the number of his Eligible Periods under the Settlement Agreement. The Court rejected Mr. Percival's suggestion that the Settlement Agreement make specific provision for him. The Court explained that the Settlement Agreement vests the Settlement Administrator with the responsibility of making eligibility determinations for all class members and if Mr. Percival disagrees with the Settlement Administrator's decision regarding his eligibility, he has the right to petition this Court for review of that decision.

**c.    Oli Glenn**

Oli P. Glenn, who did not appear at the hearing, urges that the settlement is unfair because it does not provide payouts to workers like him who worked for less than nine months. He also requests that the Court "[i]ncrease the amount of money to settle the case." (1/16/01 Glenn Obj. at 2.) As already discussed, the settlement criterion of nine months' service approximates common law employee status in a manner that Washington's courts have approved in similar class action settlements. Moreover, such a criterion has the effect of avoiding the delay, uncertainties, and expense that would occur if the parties tried the issue of each class member's common law employment status. Nine months' service represents a reasonable compromise that is fair and in accordance with applicable law.

Mr. Glenn also asserts his belief that the amount of the settlement is insufficient. He provides no description of any of the provisions of the settlement with which he takes issue. An objection that the settlement "could have been better . . . does not mean the settlement presented

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
16

[is] not fair, reasonable or adequate." *Hanlon* v. *Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998). Because "[s]ettlement is the offspring of compromise" the appropriate inquiry for a court reviewing a settlement pursuant to Rule 23(e) is "not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Id.* As discussed above, the Court finds that the overall amount of the settlement is fair and reasonable.

Mr. Glenn's objection also makes reference to the fact that members of the class did not receive medical benefits from Microsoft on account of their assignments for Microsoft. However, the class's claims in *Vizcaino* for benefits other than their ESPP and SPP benefits were dismissed by this Court in 1994, and that dismissal was not appealed. Such claims are therefore not a proper basis for settlement. Finally, the Court notes that, if the factual assertions in his objection are accurate, Mr. Glenn would not have been qualified to participate in the ESPP even if he had been considered a common law employee by Microsoft during the limited duration of his assignment. The ESPP requires participants to be employed on both the first and the last day of one of the six month offering periods in order to make an ESPP purchase. However, Mr. Glenn states that he worked on assignment at Microsoft for only five months. The Court concludes that Mr. Glenn's objections do not support a finding that the settlement is unreasonable or otherwise deficient.

**d.    Daniel Weston**

Daniel Weston, who did not appear at the fairness hearing, complains about three aspects of the settlement. First, he mistakenly asserts that the settlement requires that, in order for a class member to recover with respect to a particular offering period, he or she must have "work[ed] for the first and last weeks of the 6-month offering period[]." (1/23/01 Obj. at 2.) Instead, the settlement provides that class members who were not on assignment at Microsoft at either the beginning or the end of an ESPP period nevertheless can recover with respect to such period provided that he or she had no more than a 28-day break in service between assignments. (S.A.

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
17

¶ 32). For periods during and after 1998, class members can recover with respect to a given offering period notwithstanding a 33-day gap in service.  (S.A. ¶ 32.)

Second, Mr. Weston complains about the settlement's requirement that, in order to recover with respect to a given ESPP offering period, a class member must have performed 750 hours of service during such period, claiming that such requirement sets "a higher standard than the terms of the ESPP plan."  (1/23/01 Weston Obj. at 4.)  As with Mr. Glenn's complaint regarding the settlement's nine-month requirement, the 750-hour provision is intended to serve as a proxy for common law employee status, not as a proxy for the further restrictions of the ESPP.  This criterion, too, is similar to the mechanisms that Washington courts have approved in other similar settlements and the Court finds it acceptable.

Mr. Weston's third complaint is that the settlement's one-year holding period assumption "defies any reason or logic" and will prevent him from recovering the "vast sums of money" to which he feels entitled.  (Id.)  The one-year holding period assumption was adopted by Judge Dimmick.  It is Microsoft's position, as articulated in its pending motion on damages, that that assumption is more generous than contract-law principles would provide.  However, it is reasonable and fair for the parties to rely on Judge Dimmick's Order in fashioning the terms of the settlement.  Accordingly, the Court concludes that Mr. Weston's objections do not support a finding that the settlement is unfair.

e.    **Theodore Heckathorn**

Theodore Heckathorn, who did not appear at the fairness hearing, objects to the way in which individual recovery is linked to the ESPP's offering period structure and hypothetical ESPP purchases.  (1/25/01 Heckathorn Obj. at 1.)  He suggests that individuals who would not have been eligible to purchase shares through the ESPP, even if Microsoft had considered them its employees, should nevertheless recover under the terms of the settlement.  Although Mr. Heckathorn is correct

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
18

that, because the settlement is based on the structure of the ESPP, there may be individuals who receive nothing under the settlement but who performed assignments of longer duration than individuals who will recover under the settlement, that difference flows directly from the terms of the ESPP contract that the class alleges Microsoft breached. Treating class members differently on account of the merits of each member's claim is not only permissible, but required, under Rule 23(e). *See, e.g., Torrisi*, 8 F.3d at 1377-78 (approving of disparate treatment of class members that is based on the facts of the case and is not "irrational"). The Court therefore concludes that Mr. Heckathorn's objections do not support a finding that the settlement is unfair.

### f.    Steve Trescott

Steve Trescott, who did not appear at the fairness hearing, objects to the exclusion from the Settlement Agreement's definition of "Independent Contractor" of individuals who performed services for Microsoft as a corporation, partnership, LLC, or any legal business entity other than an individual or sole proprietorship. (S.A. ¶ 42.) Like the use of the nine-month and 750-hour requirements, the parties used the objective criterion of legal identity as a proxy for the legal status of common law employment. Accordingly, the Court concludes that the settlement's exclusion of individuals who performed services for Microsoft in the form of a corporation, partnership, LLC, or any legal business entity other than an individual or sole proprietorship is a fair and reasonable compromise, and that Mr. Trescott's objections do not support a finding that the settlement is unfair.

### g.    Deborah Jacroux and Blanc Weber

Deborah Jacroux and Blanc Weber, neither of whom appeared at the fairness hearing, object to the lawsuit itself and this settlement in its entirety because they believe they were treated fairly by Microsoft. These objections do not support a finding that the settlement is unfair.

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
19

## V.    INCENTIVE AWARDS

The terms of the Settlement Agreement provide incentive awards to the class representatives. None of the 2,745 class members who contacted class counsel after the settlement objected to the incentive awards. Four *Hughes* Named Plaintiffs (Steven Fulgham, Rebecca Hughes, Richard Pauli, and Roberta Wilson, collectively the "Fulgham Objectors") seek a higher incentive award. In addition, the Hatfield Objectors state that they want a further explanation and that the incentive amount is too low, but do not state what the amount should be nor provide any basis why they consider the awards to be too low.

Incentive awards are not uncommon in class action litigation where, as here, a common fund has been created for the benefit of the class. Incentive awards compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation. *In re Southern Ohio Corr. Facility,* 175 F.R.D. 270, 272-76 (S.D. Ohio 1997). Differences in the amount of incentive award that each class representative receives, based upon the role each played in the litigation, are proper. Here, there is a clear distinction between the *Vizcaino* Named Plaintiffs and the *Hughes* Named Plaintiffs both in the duration of the litigation and the services they provided.

The *Vizcaino* Named Plaintiffs began preparation for the administrative proceedings in 1989 and participated in the administrative proceedings that began in 1990. The *Vizcaino* class action was filed on December 29, 1992, and certified as a class action on July 21, 1993. The *Vizcaino* Named Plaintiffs were each deposed, filed declarations (Doc. 9-16, 76-90, 118-121, 193, 207-208, 284-290, 309-313, and 524), and responded to written discovery. The *Vizcaino* case file reflects 724 docket entries in this Court through February 6, 2001, which number does not include the numerous docket entries in the Ninth Court of Appeals or United States Supreme Court proceedings.

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
20

The *Hughes* class action was filed on November 17, 1998.  The *Hughes* case is a putative

class action, but no class was certified.  The *Hughes* Named Plaintiffs filed declarations in the

*Vizcaino* class action prior to filing the *Hughes* complaint.  (Doc. 345, 349-351, 353-356, 443,

453.)  They were not deposed and were not required to respond to written discovery.  The *Hughes*

case file indicates 82 docket entries in this Court through February 1, 2001, many of which

represent duplicative pleadings filed in the *Vizcaino* case file.  There have been no appellate

proceedings in the *Hughes* case.

The Settlement Agreement provides that each *Vizcaino* Named Plaintiff will receive a

$25,000 incentive payment for his or her participation as class representative, which includes

participation from 1990 through 2000 in the administrative proceedings, commencement of the

lawsuit, discovery matters (including answering interrogatories, producing voluminous personal

records, and deposition testimony), preparation of declarations, attendance at meetings, and

assisting class counsel  (S.A. ¶ 65.)  The Settlement Agreement also provides that six of the

*Vizcaino* Named Plaintiffs, Donna Vizcaino, Jon Waite, Mark Stout, Elizabeth Spokoiny, Larry

Spokoiny, and Thomas Morgan, shall each receive an additional $40,000 payment for additional

work, participation, and time-loss from employment from 1989 and thereafter.  (S.A. ¶ 66.)

The Settlement Agreement provides that each *Hughes* Named Plaintiff will receive a $7,500

incentive payment for participation as a named plaintiff.  (S.A. ¶ 67.)  The Settlement Agreement

authorizes the Court to modify the incentive payments to the named plaintiffs if such amounts are

determined to be unreasonable in the context of the results obtained and the overall settlement.

(S.A. ¶ 116.)

The Court finds, based upon the standard established in the Settlement Agreement and all of

the circumstances, that the incentive awards should not be adjusted.  In light of the longer duration

of the *Vizcaino* case; the greater involvement of the named plaintiffs in the *Vizcaino* case; the

FINDINGS OF FACT AND CONCLUSIONS OF LAW -
21

greater risk involved in the *Vizcaino* litigation than that involved in the *Hughes* case, which was filed after the *Vizcaino* class had succeeded on the ESPP liability issue; and the fact that the *Hughes* putative class was subsumed in the *Vizcaino* class not long after *Hughes* was filed pursuant to the Ninth Circuit's *Vizcaino III* decision, it is appropriate to distinguish the individual incentive awards to the *Vizcaino* Named Plaintiffs from the individual incentive awards to the *Hughes* Named Plaintiffs.

The Fulgham Objectors filed an objection requesting that the Court set both the *Vizcaino* and *Hughes* incentive payments at $25,000. Class counsel took the position that if the awards are increased for these four *Vizcaino* plaintiffs, the awards should be increased for all the *Hughes* plaintiffs. Microsoft opposed any changes. The Fulgham Objectors have not identified any factors that alter the Court's conclusion that the amount of the *Hughes* Named Plaintiffs' incentive awards are fair and not unreasonable and should not be increased.

The Court also finds, based upon all of the circumstances, that it is appropriate to distinguish among the individual incentive awards to the *Vizcaino* Named Plaintiffs. Lesley Stuart and Geoffrey Culbert were each converted to recognized "headcount" status at Microsoft in 1990, and received full Microsoft benefits thereafter. In contrast, the other six named *Vizcaino* plaintiffs were never converted to recognized "headcount" status at Microsoft, with the exception of Jon Waite, who was terminated in 1989, but was later a Microsoft "headcount" employee for approximately two and a half years. (Doc. 287.) Based on the record, with respect to the *Vizcaino* Named Plaintiffs, the amount of the incentive awards is fair and not unreasonable.

A subset of the Hatfield Objectors assert that the individual payments are "too low" and should not be characterized as "compensation solely 'for additional work, participation, and time loss from employment from 1989 and thereafter.'" (1/25/01 Hatfield Obj. at 14.) They do not suggest alternative amounts of proposed incentive awards, or any other legally relevant basis for

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 22

1    such an award, but instead, at the fairness hearing, requested appointment of a special master.  As

2    already discussed, the Court finds that the amount of the incentive awards in both cases is fair and

3    not unreasonable in the context of the results obtained and the overall settlement.  Accordingly,

4    there is no need to appoint a special master.

5    **VI.    CONCLUSION**

6           For the reasons stated, the Court finds that the proposed settlement, as clarified and

7    amended, is fair and reasonable.  Accordingly, it is ORDERED that the settlement be, and it

8    hereby is, approved pursuant to Federal Rule of Civil Procedure 23(e), subject to the Court's

9    review and potential modification of the attorney fee award under paragraph 116 of the Settlement

10   Agreement.

11          SO ORDERED this 21st day of March, 2001.

12

13

14                                                        John C. Coughenour
                                                          Chief United States District Judge

15

16

17

18

19

20

21

22

23

24

25   FINDINGS OF FACT AND CONCLUSIONS OF LAW -
26   23

1

**ANNEX A**

2

1. Abbasi, Karim A.
2. Albaugh, Karin
3. Anderson, Carol
4. Award, Elizabeth F.
5. Beebe, Russell
6. Bernstein, Margaret
7. Boyington, Marcia S
8. Brendecke, Jeffrey
9. Brinegar, Wayne F.
10. Burroughs, Kelly
11. Canfield, Miles
12. Carlile, Niccole M.
13. Compton, Marilyn A.
14. Copps, Brian
15. Copps, LaVonne R.
16. Delserone, Alicia
17. Detwiler, Landon Todd
18. Eilers, Shara
19. Faccini, Kathleen
20. Ferrara, Regine
21. Foreman, Isabelle L.
22. Freehafer, Nancy J.
23. Gadiwalla, Shamim
24. Gaines, Robert E.
25. Galbraith, Christine E.
26. Gendron, Robert
27. Gracey, Louie W. III
28. Hall, Christine A.
29. Halliday, Brandon
30. Hanson, Laura
31. Harasimowicz, Kathleen
32. Harnden, Donald J.
33. Henderson, Marilyn E.
34. Hsia, Pamela
35. Hyatt, Darrell E.
36. Idstein, Nancy
37. Innes, Daniel S.
38. Iosua, Alvin
39. Jivakov, Todor
40. Kane, Leslie Diane
41. King, Patricia A.
42. Klimek, Rene M.
43. Krystad, Byron
44. Lutian, John M.
45. Martindell, Richard
46. Mayes, Ben A.

47. Maynard, Tracy
48. McGifford, Kathryn S.
49. McGill, Marilyn
50. Mercer, Anne
51. Miah, Abu
52. Mincin, Kurt
53. Moerer, Briana
54. Moore, Matthew Park
55. Nelson, Emma
56. Niland, Claire
57. O'Hara, Linda
58. Paoletti, Valerie
59. Park, Sonhui
60. Parker, Andrew
61. Pyfer, Lindsay A.
62. Rauch, Lynn
63. Redfern, Kristin E.
64. Reger, Carol S.
65. Rich, Cassandra
66. Rumsey, Jonathan A.
67. San Jule, Todd
68. Saracen, Esther
69. Savage, Patricia J.
70. Schare, Julie M.
71. Schmeller, Dana
72. Schnepf, Brett
73. Sergoyan, Lynda V.
74. Sloan, Mary B.
75. Smith, Amanda J.
76. Stewart, Leslie A
77. Strom, Sigrid Anne
78. Ulus, Teresa M.
79. Uyeshiro, Debbie
80. van de Erve, James
81. Weber, Blanc
82. Wen, Cheryl L.
83. West, Betsy
84. Wilkerson, Ryan R.
85. Wilks, Allien R.
86. Wilson, Janet R.